IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 16–30–BLG–SPW |
| Plaintiff/Respondent, | |
| vs. | ORDER |
| MATTHEW STONEY OLSON, | |
| Defendant/Movant. | |

Defendant/Movant Matthew Stoney Olson seeks to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Docs. 155, 176.) For the reasons provided below, his motion is denied.[1]

## BACKGROUND

On March 2, 2016, a grand jury indicted Olson on one count of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) (Count 1) and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B)

---

[1] A court need not hold an evidentiary hearing if the allegations are "palpably incredible" or "patently frivolous or false" or if the issues can be conclusively decided based on the evidence in the record. *Blackledge v. Allison*, 431 U.S. 63, 76 (1977); *see United States v. Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998) (explaining that a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief"). Because Olson's motion can be conclusively decided on the basis of the existing record, an evidentiary hearing is not necessary.

1

(Count 2). (Doc. 1.) Prior to trial, both parties filed motions in limine. (*See* Docs. 64, 72.) The government successfully sought to admit allegations that Olson had molested his minor step-daughters ten years prior.[2] (Doc. 64.) In turn, Olson sought to admit evidence related to his defense theory that someone else, specifically his ex-girlfriend's fiancé—Homer "Mike" Esterbrook—downloaded the child pornography on Olson's laptop. (Doc. 73.) Olson's request was two-pronged: he sought to introduce evidence of the contentious custody battle involving his ex-girlfriend and Esterbrook as well as evidence that Esterbrook had been accused of molesting Olson's children. (*See* Doc. 74.) Ultimately, at the final pretrial conference, the Court determined that Olson could present evidence related to the custody dispute insofar as it spoke to a potential motive by Esterbrook, but the Court excluded any reference to the sexual molestation allegations as they did not support a "frame up" theory. (*See* Trans. 7–26.)[3]

## I.     Trial

A three-day jury trial was held in October 2017. (*See* Docs. 138–41 (transcripts), 96 (verdict).) The government called three government investigators as witnesses and admitted ten exhibits. (*See* Docs. 102 (witness list), 103 (exhibit list), 103-2 (exhibits).) The defense called five fact witnesses and admitted one

---

[2] Ultimately, the government did not introduce this evidence at trial.
[3] The trial transcripts are filed in the docket at Docs. 138–41 and are cited as "Trans. [page no.]."

exhibit. (*See* Doc. 103-2.)  The government then recalled two of the investigating agents on rebuttal.  The government's case and the defense's theory are outlined below.

### A.    The Case Against Olson

In May 2015, Agent Al Kinsey, working for the Department of Homeland Security in Great Falls, discovered an IP address in Circle, Montana—identified as 216.228.45.129—that had over 100 files of suspected child pornography available for download on a peer-to-peer file sharing network.  (Trans. 61–62.)  SA Kinsey did this by utilizing Child Protection System ("CPS") software, which identifies IP addresses that are offering child pornography for download on publicly-accessible file sharing networks.  (Trans. 60.)  Using this IP address, SA Kinsey requested the Internet subscriber data from the Internet provider, which identified Olson.  (Trans. 62.)  On June 15, 2015, SA Kinsey and other law enforcement officers executed a search warrant on Olson's home.  (Trans. 63.)  They found the front door unlocked and number of computers in the residence, including a silver HP laptop in the master bedroom.  (Trans. 64–65; Ex. 1 (photo of where laptop was found); Ex. 2 (laptop itself).)  When Olson's mother, Debra Olson, arrived, she identified the various computers, specifically stating that the silver HP belonged to Olson and that no one else used it.  (Trans. 68, 71.)

After the search warrant was executed, SA Kinsey was contacted by Criminal Investigator Gary Seder from the Montana Department of Justice because Seder had seen in a law enforcement database that SA Kinsey was investigating the same IP address that Seder had also looked at. (Trans. 165.) Seder was able to actually download files from the same IP address—216.228.45.129—using the public "peer-to-peer" network and those files were child pornography. (Trans. 166.)

The digital items seized from Olson's residence—three laptops, a cell phone, a digital camera, and an SD card—were subsequently forensically examined by Special Agent Brent Johnsrud. (Trans. 84–85.) Only the silver HP laptop was found to have child pornography on it. (Trans. 85.) In order to review the contents of that laptop, Johnsrud removed the battery and copied the hard drive. (Trans. 86.) He then simulated a "boot up" on another device, bypassing the login screen. (Trans. 88.) He discovered there was only one active account on the computer—username "Fuckoff". (Trans. 92; Ex. 5.) He further discovered that the laptop had the "peer-to-peer" file sharing program known as "eMule," that had been on the computer since October 2011. (Trans. 94, 97.) A "peer-to-peer" file sharing program, such as eMule, is essentially a decentralized file sharing network where anyone with access to the network can share and download files with each other. (Trans. 94.) Such networks are a popular method of sharing child pornography as

4

they allow users to search specific terms by file name—such as jailbait, preteen, pedo, or preteen hardcord (PTHC). (Trans. 96.) Johnsrud was then able to review the list of files in the eMule program that had been selected for download the last time the program was launched, (Trans. 102; Ex. 7), which contained files indicative of child pornography, (Trans. 104). Johnsrud also discovered that the user of the eMule program had used search terms that elicited search results indicative of child pornography, (Trans. 108–09, 111), and he discovered actual child pornography in the downloads files, (Trans. 113: *see* Ex. 9).

As it relates to timing, Johnsrud was able to determine when a suspect file was first and last accessed using what is known as a "link" file. (Trans. 114, 126, 161.) These access times also allowed Johnsrud to see what other programs were being accessed simultaneously, such as Olson's Skype account, Olson's Facebook account, and Olson's email account. (Trans. 126–29.) Ultimately, Johnsrud discovered 15 full-size child pornography images, 267 thumbnail child pornography images, and 22 child pornography videos. (Trans. 129–32; *see* Ex. 11 (representative sample).) According to Johnsrud, the visual depictions contained a consistent victim type: "[c]aucasian females . . . between 5 years old and 11 years old." (Trans. 138.) Using the associated "link" files, Johnsrud was able to determine that child pornography had been accessed on the laptop between April

5

and June 2015, including the night before the search warrant was executed. (*See* Trans. 118–22.)

**B.    The Defense Theory**

At trial, the defense argued that while the government could prove that there was child pornography on Olson's laptop, it could not prove beyond a reasonable doubt that it was Olson himself that put it there. (*See* Trans. 55.)  Rather, the defense pointed the finger at Esterbrook, the fiancé of Olson's ex-partner.  To this end, the defense called five fact witnesses: Cynthia Smith[4] (Olson's ex-girlfriend), Debra Olson (Olson's mother), Hunter and Stoney Olson (Olson's minor children), and Olson himself.

Consistently, in his opening at trial, defense counsel specifically stated that the dispute in the case was *who* downloaded the child pornography, (*see* Trans. 55), and that the evidence would show that everyone in the household used the computer, (*see* Trans. 56), and that Olson would deny receiving and possessing child pornography, (*see id.*).  Defense counsel then got government witnesses to concede that they could not directly place Olson—as opposed to another individual—in front of the computer.  (*See* Trans. 76 (Kinsey), 150–52 (Johnsrud).)  Then, in its case-in-chief, defense counsel laid the groundwork through Olson's ex-girlfriend, mother, and children that Esterbrook and Olson did

---

[4] Smith was called by deposition.

6

not get along in light of the ongoing custody dispute, (*see* Trans. 189, 244, 294, 316), Esterbrook visited Olson's house on occasion, (*see* Trans. 191), Olson's laptop was generally kept in the kitchen where everyone had access to it, (*see* Trans. 192, 194, 249, 259, 283, 319), the laptop password was widely known, (*see* Trans. 283, 317–18), and Olson's house was generally unlocked, (*see* Trans. 193, 260–61, 294).  Olson himself then testified to these same facts, specifically stating that he believed that Esterbrook "put [the child pornography] on [his] computer to finally get [Olson] away from [his] children." (Trans. 360; *see also id.* 372–73 (responding to the government's skepticism regarding Esterbrook's involvement).)

Finally, in closing, defense counsel argued that the government failed to prove that Olson was the individual that downloaded the child pornography, (*see* Trans. 438), recounting that the house was generally unlocked (Trans. 438), Olson's computer was generally accessible and his password was widely known, (Trans. 439), Olson was involved in a contentious custody dispute, (Trans. 439), and that downloads could run in the background over a long period of time, (Trans. 441).  Defense counsel further emphasized that the government should have done further investigation and not just relied on the forensic computer evidence: "The prosecution would have you believe that the forensic evidence is overwhelming evidence of guilt, and it's not.  It's part of the story." (Trans. 442–43.)  Counsel

then stated that Olson was firm in his belief that he did not do this and that, in fact, Esterbrook was to blame. (Trans. 451.)

## II.  The Verdict, Sentencing, and Appeal

Olson was ultimately found guilty on both charges. (Doc. 96.) The jury also returned a "true" verdict on the forfeiture allegation associated with the silver HP laptop. (*Id.*) On February 15, 2018, Olson was sentenced to 60 months on Count 1 and a consecutive 24 months on Count 2, followed by twenty years of supervised release. (*See* Doc. 126 (Judg.).) Consistent with the sentencing objectives of 18 U.S.C. § 3553(a), this represented a significant downward variance from Olson's advisory guideline range of 210 to 262 months. (*See* Doc. 127 (SOR).) Olson timely appealed the Court's exclusion of evidence related to Esterbrook's alleged molestation of Olson's children and the sufficiency of the evidence. (Doc. 129.) In March 2019, the Ninth Circuit affirmed Olson's conviction in an unpublished memorandum disposition. (Docs. 149, 150.)

## III.  Current Motion

On June 9, 2020, Olson filed a pro se motion to vacate under 28 U.S.C. § 2255. (Doc. 155.) That motion contained three grounds for relief: (1) the ineffective assistance of both trial and appellate counsel; (2) prosecutorial misconduct; and (3) a jurisdictional defect related to the underlying search warrant. (*See id.*) Following a request for more information from Olson's trial counsel

regarding counsel's decision not to call a forensic computer analyst at trial, (*see* Docs. 157, 159, 160, 161), Olson's motion was prescreened under 28 U.S.C. § 2255(b) and Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts, (Doc. 162).   Counsel was appointed, (Doc. 164), and an amended § 2255 motion was filed on January 25, 2022, (Doc. 176).   On July 7, 2022, the government was ordered to respond to the amended motion, (Doc. 177), which it did on October 24, 2022, (Doc. 181).   Olson filed a reply on November 23, 2022.   (Doc. 183.)

**ANALYSIS**

Olson's amended motion pursues only claims of ineffective assistance of counsel, alleging defense counsel: failed to object to venue; failed to challenge the underlying search; failed to call a computer expert and two specific fact witnesses; failed to investigate or pursue fingerprint evidence; and failed to object to cumulative images of child pornography.   (*See* Doc. 176.)   In response, the government argues that Olson's motion is untimely and that, even if considered on the merits, lacks a basis in law or fact.[5]   These arguments are addressed in turn.

**I.      Timeliness**

The government argues Olson's motion is untimely because it was filed five days after the one-year statute of limitations expired under 28 U.S.C. § 2255(f).

---

[5] Olson's reply brief addresses only timeliness and venue.   (*See* Doc. 183.)

"For the purpose of starting the clock on § 2255's one-year limitation period . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003). Here, Olson's direct appeal was finalized on March 6, 2019, which meant that the 90-day period for filing a petition for writ of certiorari expired on June 4, 2019. *See* Rule 13.1–13.3, Rules of the Supreme Court of the United States. Thus, it would appear that Olson had to file his habeas petition on or before June 4, 2020. However, his pro se motion was not received by the Court until June 9, 2020. (*See* Doc. 155.)

Nevertheless, as recognized by the government, the "prison mailbox rule" can add a few days to this timeline so long as the filing was "deposited in the institution's internal mailing system on or before the last day of filing." Rule 3(d), Rules Governing Section 2255 Proceedings. To benefit from this rule, however, the defendant must use the institution's "legal mail" system if one exists and include a notarized statement averring the date of deposit and that first-class postage has been prepaid. *Id.* Thus, the timeliness of his motion turns on whether the prison mailbox rule applies.

Olson is incarcerated at FCI Safford, Arizona, which has a system designed for legal mail that requires that such mail be specifically marked and provided to the Records Office. (*See* Doc. 181 at 22 n.5.) The court record does not include an

image of the mailing envelope, making it impossible to tell if it was properly marked. Nor does his motion state that he prepaid first-class postage. However, the motion is dated May 31, 2020, and arguably includes a sworn statement to that effect. (*See* Doc. 155-1 at 6.) While the government points out that May 31, 2020 was a Sunday (when the prison mailroom was not open), Olson persuasively argues that his attempt to mail his motion coincided with the early months of the global COVID-19 pandemic. Given the internal disruptions that were occurring within the Bureau of Prisons as well as the external disruption in the infrastructure and mail systems in those first six months of the pandemic, the Court cannot find based on this record that Olson failed to timely file his habeas petition. It is therefore addressed on the merits below.

## II.    Merits

The Sixth Amendment guarantees the right of effective assistance of counsel at all critical stages of a criminal proceeding. *See United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997). To prevail on an ineffective assistance of counsel claim, a petition must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). That is, the petition must show not only that there was a deficiency, but that the

deficiency was prejudicial. *Id.* at 692. "[I]t is unnecessary to consider the prejudice prong of *Strickland* if the petition cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To wit, the Supreme Court has cautioned that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

As mentioned above, Olson alleges counsel was ineffective on five grounds: (1) failing to object to venue; (2) failing to challenge the search; (3) failing to call an expert witness on computers and two fact witnesses; (4) failing to investigate or pursue fingerprint evidence; and (5) failing to object to the presentation of cumulative images of child pornography. (Doc. 176.) Olson further argues that even if these errors are individually insufficient to warrant relief, their cumulative effect warrants granting his motion. (*Id.*) These claims lack merit.

## A.   Claim One: Venue

Olson first argues that trial counsel was ineffective when he failed to object to the trial being set in Billings, Montana. Olson insists that the case should have venued closer to where the offense was committed in Circle, Montana, specifically either Glasgow or Miles City. That contention fails under both prongs of *Strickland*.

As recognized by Olson, venue is tied to a *district*, not a particular locale within a district: "a defendant in a criminal case has a constitutional right to be tried in a district where the crime was committed." *United States v. Lukashov*, 694 F.3d 1107, 1119 (9th Cir. 2012) (citing U.S. Const. art. III, § 2, cl. 3); *see also* U.S. Const. amend. VI. (entitling a defendant to "an impartial jury of the State and district wherein the crimes shall have been committed."). This constitutional mandate is then reflected in the Federal Rules of Criminal Procedure, which provide: "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. And, as further recognized by Olson, "Montana, exclusive of Yellowstone National Park, constitutes one judicial district." 28 U.S.C. § 106. Thus, under the Constitution and by statute, Olson need only have been tried within the geographic boundaries of the state of Montana. Because he was, trial counsel's failure to request an alternative venue did not fall below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688.

Olson maintains, however, that given the size of the District of Montana, counsel should have sought to change venue to a closer locale. He further argues that "this Court's divisions are improperly drawn under the law." (Doc. 183 at 4.) Not so. While Title 28 identifies 11 locations where court "shall be held" within the District of Montana and those locations include Miles City and Glasgow, *see* 28 U.S.C. § 106, the Chief Judge of the District has the discretion to create rules that divide the Court's business among the district judges, 28 U.S.C. § 137. Consistently, the Local Rules of this Court divide the District into five divisions by county. *See* D. Mont. L.R. 1.2 (eff. Mar. 1, 2016). As is relates to the case at hand, Circle, Miles City, Glasgow, and Billings all fall within the same divisional venue: Billings. *See* D. Mont. L.R. 1.2(c)(1) (eff. Mar. 1, 2016). Thus, even if proceedings were physically held in either Glasgow or Miles City, under the District's 2017 Jury Plan, Olson's jury pool would be comprised of the same potential jurors as his Billings trial, including jurors from the places he identified and the surrounding communities.[6] *See* D. Mont. Jury Plan, §§ 1.08, 1.10, 2.04, 3.01, 4.01 (eff. Feb. 23, 2017). As a result, even if counsel should have sought a change of venue within the Billings Division itself—a dubious proposition—the

---

[6] The potential venire in this case included jurors from Dawson, Richland, Rosebud, Prairie, and Garfield Counties and the empaneled jury included jurors from Richland, Rosebud, and Garfield Counties. (*See* Jury List, Doc. 99.)

14

jury pool would be the same, obviating prejudice. *Strickland*, 466 U.S. at 692. Accordingly, Olson's first claim fails.

**B.    Claim Two: Search**

Olson further argues that trial counsel was ineffective for failing to challenge the underlying search in the case "despite the failure of the investigating agent to properly use an administrative subpoena to obtain the IP address of Mr. Olson's computer." (Doc. 176 at 7.)  Olson's argument fails under *Strickland* because, as he himself recognizes, IP addresses are generally not protected by the Fourth Amendment, *see United States v. Forrester*, 512 F.3d 500, 504 (9th Cir. 2008), especially in the context of peer-to-peer filing networks, *see United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008) (holding that any expectation of privacy a defendant had in his personal computer does not "survive [the defendant's] decision to install and use file-sharing software, thereby opening his computer to anyone else with the same freely available program"); *United States v. Borowy*, 595 F.3d 1045, 1048 (9th Cir. 2010) (rejecting expectation of privacy argument where defendant "exposed the entirety of the contents of his files to the public" through a peer-to-peer network); *see also United States v. Martinez*, 588 F. App'x 741, 741 (9th Cir. 2014) ("The use by law enforcement of proprietary forensic software packages that revealed information, such as hash values and IP addresses, did not make the search unlawful, as there was no reasonable

15

expectation of privacy in this information, either."). Because law enforcement discovered Olson's IP address through the public sphere—the "eMule" peer-to-peer filing network—neither a warrant nor an administrative subpoena under 18 U.S.C. § 2703 were required. As such, existing law provided no reasonable basis to challenge law enforcement's acquisition of Olson's IP address. Trial counsel was therefore not ineffective for failing to do so.

Even so, Olson maintains that trial counsel should have made such an argument because "good authority exists to suggest" that the Ninth Circuit's decision in *Forrester* "was wrong and the ruling should be overturned." (Doc. 176 at 10 (citing *Kyllo v. United States*, 533 U.S. 27, 40 (2001)).) But what counsel allegedly "should" have done and what qualifies as constitutionally adequate counsel under *Strickland* are not concomitant. Given the breadth of existing support for the forensic computer program used here, *See People v. Worrell*, 71 N.Y.S. 3d 839, 854 (Sup. Ct. N.Y. 2018) ("[E]very Fourth Amendment challenge to [the use of the Child Protection System ("CPS") program] has failed in federal courts, which have repeatedly found CPS to be both a reliable investigative tool and that it does not perform a search of suspects' computers.") (collecting cases), Olson has not demonstrated that counsel's failure to challenge existing precedent fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (explaining

that counsel "cannot be required to anticipate" a later court decision).  Olson's

second claim therefore also fails.

### C.      Claim Three: Trial Witnesses

Olson further argues that trial counsel was ineffective for failing to call a

forensic computer expert and two facts witnesses in support of Olson's contention

that Esterbrook, his ex-girlfriend's fiancé, was actually the one that downloaded

the child pornography that was found on Olson's computer.  "A lawyer who fails

adequately to investigate, and to introduce into evidence, information that

demonstrates his client's factual innocence, or that raises sufficient doubt as to that

question to undermine confidence in the verdict, renders deficient performance."

*Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (internal quotation marks and

alteration omitted).  Nevertheless, "strategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually

unchallengeable." *Strickland*, 466 U.S. at 690.  "A disagreement with counsel's

tactical decision does not provide the basis for declaring that the representation

was constitutionally deficient." *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006).

Because trial counsel's decision not to call the identified witnesses in this case was

strategic, Olson fails to show it fell "outside the wide range of professionally

competent assistance." *Strickland*, 466 U.S. at 690.

### 1.      Computer Expert

17

Olson first argues that the defense should have called its own computer expert to "shed light on how easy it is to use a computer despite not knowing the password, or how easy it is to guess a password (as it would have been in this case), or how easy it would have been for one of the third parties who [sic] regular access to the computer to have inadvertently downloaded the illicit material." (Doc. 176 at 12.) Olson further argues that a computer expert "could have testified about how the IP address is hard to find without specialized expertise or equipment," (*id.*), and could have clarified the nature of "link files," (*see* Doc. 161 at 2 (ex parte)). Because the decision to call a trial witness is often strategic, *see Lord*, 184 F.3d at 1095 ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."), the real question is whether counsel made an *informed* decision not to call a trial witness based on "reasonable investigation," *Strickland*, 466 U.S. at 690–91. That is the case here.

Although it is unclear from the trial record whether defense counsel consulted with a computer expert, counsel was ordered to respond *ex parte* to that very inquiry. (*See* Doc. 157.) Counsel did so, indicating that he consulted with a computer expert and determined that the expert's proffered opinion would not have been helpful in defending the case. (*See* Doc. 160 (filed *ex parte*).) Even if Olson disagrees with that assessment, the record shows that it was an informed decision

18

following a reasonable investigation.  Moreover, many of the concepts Olson allegedly would have explored with a defense computer expert were introduced through other witnesses at trial.  (*See, e.g.*, Trans. 74 (Agent Kinsey conceding that anyone with the WiFi password could have used the IP address), 148 (Agent Johnsrud confirming the same), 150 and 158 (Agent Johnsrud confirming anyone with password could access computer and that downloads could be occurring in the background), 163 (Agent Johnsrud confirming that they could not definitively say who used the computer to download the child pornography files), 192–94 (Cynthia Smith testifying that Olson always left his laptop on the kitchen table and the house was always unlocked), 249 (Debra Olson testifying that Olson's laptop was on kitchen table, house was unlocked, and everyone knew laptop password).

Accordingly, Olson fails to show that trial counsel's "representation was constitutionally deficient" for not calling a computer expert at trial.  *Raley*, 470 F.3d at 799.

### 2.    Fact Witnesses

Olson further argues that trial counsel should have called two fact witnesses in support of the defense theory that Esterbrook framed Olson.  The putative witnesses were Esterbrook himself and Esterbrook's brother-in-law, Mike Carro. Ultimately, while the trial record does not show whether defense counsel spoke to

either of these men, the defense's trial strategy demonstrates that counsel was aware of this defense and strategically pursued it.

"Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691. Here, Olson told his attorneys that he believed someone else, specifically Esterbrook, was responsible for the alleged conduct. Trial counsel pursued that theory with vigor. For example, counsel filed a pretrial motion in limine seeking to introduce allegations that, as part of a contentious custody dispute, Esterbrook put child pornography on Olson's computer and that Esterbrook had sexually molested Olson's children. (*See* Doc. 73.) The Court considered that motion during the final pretrial conference and determined that while the defense could point the finger as Esterbrook based on the ongoing custody dispute with Olson's ex-girlfriend, that theory was not premised on Esterbrook's alleged sexual misconduct, which would therefore be excluded. (*See* Trans. 7–28.) Then, as discussed above, counsel pursued Esterbrook's opportunity, means, and motive throughout the trial. Counsel did not, however, call any witnesses that could cast doubt on the theory, such as Esterbrook himself. Given this unrefuted defense narrative, Olson fails to show that defense counsel's

decision not to call either Esterbrook or Carro fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Moreover, while there were allegations that Esterbrook had sexually assaulted Olson's children, (*see* Doc. 73), the Court excluded reference to that conduct, (*see* Trans. 11–26). And even if Esterbrook himself somehow opened the door to this prior conduct—a dubious proposition—its admission would only have forced the government to present the evidence of Olson's prior hands-on sexual misconduct, which it otherwise chose not to present. (*See* Doc. 64.) Accordingly, other than to confirm that the two men disliked each other—a premise well-presented through other testimony—Esterbrook could only harm Olson's defense theory.

Olson's argument regarding Carro fares no better. According to Olson, Carro would testify that he heard Esterbrook threaten to put child pornography on the computer of some other person (not specifically Olson). (*See* Doc. 155-1 at 3.) But, as argued by the government, such testimony would have been hearsay and a defendant does not have an "unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Moreover, even if admissible, this line of inquiry would, as discussed above, potentially open up Olson to questions of motive, i.e., the prior allegation that Olson himself sexually abused his step-daughters. Finally, Olson has provided

no evidence—such as an affidavit from Carro—to support his assertion of what Carro's testimony would entail.  Instead, he once again assumes that Carro would take the stand and speak in Olson's favor, not to his detriment.

Ultimately, the relevant inquiry under *Strickland* is whether defense counsel made an informed decision about a witness based on a reasonable investigation. Here, counsel was able to tell an unrefuted story about a man that had motive, means, and opportunity to plant child pornography on Olson's computer.  The tactical nature of defense counsel's decision is only made too clear when considering the facts of a case where the Ninth Circuit determined a lawyer's failure to investigate and call certain trial witnesses did in fact violate *Strickland*. In *Lord v. Wood*, defense counsel failed to interview or call at trial three alibi witnesses.  *See* 184 F.3d at 1093–95.  There, the court specifically noted the weakness of the prosecution's case—no forensic evidence or witnesses—and the fact that the three witnesses had no ties to the defendant and "with no reason to lie, could have given [the defendant] a formidable defense: The victim was seen walking around well after the time [the defendant] was supposed to have killed her." *Id.* at 1094.  The court further noted that presenting the witnesses "would not have opened the door to any damaging evidence" nor tainted the defendant's version of events.  *Id.* at 1094–95.  The situation here could not be more different. The government had forensic computer analysis showing that child pornography

was downloaded onto Olson's computer, the putative witnesses were involved in a custody dispute with Olson, allowing their testimony would potentially open the door to evidence of Olson's prior hands-on conduct, and the witnesses could—and likely would—contradict Olson's theory of the case.

To be sure, the Ninth Circuit has held trial counsel to be ineffective for failing to interview or call as a trial witness a defendant's brother who had confessed, on several occasions, to the murder for which the defendant was on trial. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). But there, the brother "declared unequivocally that he was the one who shot the deceased," and there "[wa]s simply nothing in the record . . . that suggest[ed] even a colorable explanation for [counsel]'s conduct." *Id.* Esterbrook's involvement here, on the other hand, is not a smoking gun; rather, Esterbrook was, at best, an avenue of reasonable doubt.

Because the record in this case shows defense counsel had strategic reasons for presenting the case as it was presented, Olson's third claim fails as well.

**D.     Claim Four: Fingerprint Evidence**

In addition to arguing that counsel failed to investigate Esterbrook and Carro, Olson insists that counsel was ineffective for failing to get the silver HP laptop dusted for fingerprints. As argued by the government, however, Olson fails to show that counsel's performance was constitutionally deficient given the risk

23

such a request posed to the defense's theory of the case.  To be sure, finding

Esterbrook's fingerprints on the laptop would have strongly supported the idea that

Esterbrook, not Olson, downloaded the child pornography.  However, not finding

Esterbrook's fingerprints on the laptop would give the government strong evidence

that the defense was just blowing smoke.  As the trial actually played out, the

government was critical of the "Esterbrook did it" theory and attempted to poke

holes in it.  (*See, e.g.*, Trans. 372–73.)  However, the government did not have any

forensic evidence showing that Esterbrook *did not* use the computer; the absence

of his fingerprints would have provided that evidence.  Instead, as recognized by

Olson, defense counsel strategically used Agent Kinsey's testimony that no

fingerprint evidence was collected to cast doubt on the scope of the government's

investigation without triggering a risk of adverse forensic evidence.  (*See* Trans.

76.)  Olson's fourth claim therefore fails as well.

### F.     Claim Five: Number of Child Pornography Images

Finally, Olson argues that the exhibits of child pornography presented to the

jury were excessive, resulting in an unfair prejudice to him that was not

outweighed by the probative value of the evidence in violation of Federal Rules of

Evidence 401 and 403.[7]  That claim also lacks merit.

---

[7] Olson does not argue, nor does the record indicate, whether defense counsel
agreed to stipulate that the images were child pornography.  The absence of such a
stipulation does not mean counsel's representation was constitutionally deficient,

Notably, prior to trial, defense counsel filed a motion in limine, requesting the Court exclude presentation at trial for viewing by the jury a "redundantly large number of pornographic images." (*See* Docs. 49, 51.) Although the motion was denied and defense counsel did not renew it at trial, (*see* Doc. 64), it is unclear how trial counsel could be found ineffective for arguing the very thing that Olson now insists should have been argued. Moreover, the jury was ultimately shown a small, highly curated collection of images. Investigators discovered over 250 images and 22 videos of child pornography on the laptop. (*See* Trans. 129–32.) Those videos totaled eight hours and thirty minutes of child pornography. (*See* Trans. 133.) For trial, the government asked Agent Johnsrud to prepare two, 30-second snippets of the videos that reflected the nature of the collection. (Trans. 133–34; Ex. 11.) Agent Johnsrud also prepared 15 individual images for the jury. (Trans. 134; Ex. 11.) As a result, the jury was only exposed to a fraction of the images and videos at issue in the case.

Olson incorrectly argues that "[s]eeing the actual images does not make any element [of the charged offenses] more or less likely to be true." (Doc. 176 at 15.)

---

however, as "the prosecution is entitled to prove its case by evidence of its own choice." *Old Chief v. United States*, 519 U.S. 172, 186 (1997). As such, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Id.* at 186–87. Thus, the government had the option to present the images even if Olson did not dispute their contents. *See United States v. Lee*, 197 F. App'x 698, *1 (9th Cir. 2006).

To the contrary, the jury was required to find that the visual depictions were "of a minor engaging in sexually explicit conduct" and/or that the images possessed were "of child pornography." (Final Jury Instr. Nos. 36, 38, Doc. 100 at 40, 42; *see also* Final Instr. Nos. 39, 40, and 41 (defining "child pornography," "visual depiction," and "lascivious exhibition of genitals or pubic area of any person").) And, as argued by the government, "the images themselves, published to the jury as part of the government's detailed and comprehensive forensic evidence regarding the downloading, viewing . . . and storing of files . . . were probative of the state of mind with which the files were received and possessed." *Ganoe*, 538 F.3d at 1123–24. For example, the government was able to argue, based on the content of the images, that they all contained depictions of similar victims, (*see* Trans. 138), undermining the defense theory that the images were randomly downloaded as part of a frameup.

Because the government presented a fraction of the images relevant to the underlying conduct consistent with both Rule 401 and 403, Olson's fifth claim also lacks merit.

### G.    Claim Six: Cumulative Error

Finally, Olson argues that even if one of the issues addressed above is not sufficient to warrant habeas relief, the cumulative effects of the errors is. This argument is unpersuasive, however, given the absence of error as discussed above.

## III.   Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Olson's claims fail because counsel's performance neither fell below an objective standard of reasonableness nor caused prejudice.  The § 2255 motion involves no open questions of law and no close factual questions.  A COA is not warranted.

CONCLUSION

Based on the foregoing, IT IS ORDERED:

1. Olson's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (Docs. 155, 176) is DENIED.

2. A certificate of appealability is DENIED.  The clerk shall immediately process the appeal if Olson files a Notice of Appeal.

3. The clerk shall ensure that all pending motions in this case and in CV 20–

78–BLG–SPW are terminated and shall close the civil file by entering judgment in

favor of the United States and against Olson.

DATED this _____9th_____ day of March, 2023.


                                        Susan P. Watters, District Judge
                                        United States District Court